J. L. HORNSBY and ROBERT L. MUNROE, Administrators of the Estate of OTIS M. MUNROE, Deceased, Respondents, v. EMMA KNORPP ET AL., Appellants.

St. Louis Court of Appeals. Opinion Filed June 7, 1921.

1. **PLEDGES: Contract Susceptible of Two Constructions: Construed Favorable to Pledgor.** In construing a contract of pledge, if it is susceptible of two constructions, that one should be given to it which is the more favorable to the pledgor.

2. ————: **Pledge of Collateral to Secure Note: Sale: Construction of Contract.** A contract of pledge of collateral to secure notes *held* reasonably susceptible of the construction that it was not the in-

tention of the parties that a purchaser should have the right to avail himself of any margin or surplus of the collateral in satisfaction of his own unsecured claims against the pledgor.

3. **EXECUTORS AND ADMINISTRATORS**: Insolvent Estate: Pledges: Purchasers of Secured Notes: Applying Surplus to Payment of Unsecured Claims: Illegal Preference. After the death of the pledgor, the maker of notes, who pledged collateral to secure their payment, defendants could not, by purchasing the notes held by a bank, obtain the benefits of the surplus of the collateral pledged with the notes in satisfaction, *pro tanto*, of their own unsecured claims, thus preferring themselves as creditors of the pledgor's insolvent estate.

4. ———: ———: ———: ———: Surplus Becomes Trust Fund for Benefit of Creditors. At the death of the pledgor, the maker of notes, who had pledged collateral with a bank to secure their payment, the bank had possession and control of this collateral as pledgee, but the pledgor retained an interest therein, as to which interest the pledgee bank became a trustee, and purchasers of the notes and collateral from the bank became, in like manner, trustees with reference to the interest therein of the estate of the pledgor, then deceased, and upon the pledgor's death that interest passed to the administrators of the deceased pledgor, and any surplus value in the collateral, over and above that sufficient to satisfy the original debt to the bank, became, in effect, a trust fund to be administered for the benefit of the creditors of the insolvent estates of the deceased pledgor.

5. **PLEDGES**: Pledge of Collateral to Secure Notes: Death of Pledgor: Sale: Surplus Retained by Purchaser: Tender by Administrator: Conversion. Where, when the administrators of the estate of the deceased pledgor of collateral with a bank to secure the payment of his notes undertook to make tender of the amount due on the notes to the purchasers thereof from the bank, they were informed that defendants would not surrender the notes and collateral upon a payment of the original indebtedness, but would hold the collateral to satisfy unsecured claims of the defendants against the estate of the deceased pledgor, such position taken by defendants rendered a proper tender, if made, a vain and idle ceremony, and hence dispensed with the necessity of making such tender, and defendants then placed themselves in the position of wrongfully withholding the collateral for an unlawful purpose, and were guilty of a conversion thereof.

6. ———: ———: ———: ———: Pledgee's Conversion of Pledged Collateral: Debt Set Off Against Damages. A pledgee, when sued

.for conversion of the pledged collateral, is entitled to have the debt secured by such collateral set off against the amount of damages recoverable, the pledgor being entitled to recover the actual loss suffered by him by reason of pledgee's wrongful act, which is the value of the collateral less the amount of the debt.

Appeal from the Circuit Court of the City of St. Louis.— *Hon. J. Hugo Grimm,* Judge.

AFFIRMED.

*Wilfley, McIntyre, Hensley & Nelson, Wendell Berry* and *Clyde Williams* for defendants.

(1) Under the collateral agreement attached to the notes given by O. M. Munroe to the Broadway Bank, the defendants, as the successors and assigns of the Broadway Bank, had a perfect right to apply the proceeds, in excess of the amount due on said notes upon the other indebtedness of O. M. Munroe to said defendants. 31 Cyc, pages 822, 848-9; Belden v. Perkins, 78 Ill. 449; Jarvis v. Rogers, 15 Mass. 389; Goss v. Emerson, 28 N. H. 38; Elliott on Contracts, par. 3045; Jones on Collateral Securities, sec. 605; Cross v. Brown, 33 Atl. 371; 7 Words & Phrases, page 6748. (2) Upon the theory of this case as set up in plaintiff's petition, it was necessary for him to tender the amount due on the two $5,000 notes before he could ask for the collateral deposited with said notes under the collateral pledge attached to same. There was no valid tender of payment by plaintiff to defendants for the following reasons: (a) The so-called tender consisted of ''chips and whetstones,'' including certain notes signed by Wm. Knorpp, in which the other defendants were in no way interested. Schaaf v. Fries, 90 Mo. App. 111; Talty v. Friedman's Savings & Trust Co., 93 U. S. 321; Landis v. Saxton, 89 Mo. 375. (b) Included in the so-called tender was a note of W. E. Crow to Wm. Knorpp for $333, which had long since been paid, without which note and about ten years interest thereon, the amount was wholly in-

adequate. Deweiler v. Breckenkamp, 83 Mo. 45; Smith v. Pilcher, 130 Ga. 350; 38 Cyc, page 136. (c) The tender was not kept up or continued, but was practically withdrawn, and for that reason, under the law could avail plaintiff nothing. Sanders v. Mosbarger, 159 Mo. App. 488. (3) Under no construction of the pleadings can plaintiff recover the excess received from sale of collateral above amount due on the notes for the payment of which said collateral was pledged. This is a suit for conversion in which plaintiff seeks to recover the full value of all the collateral pledged on the theory as set forth in the petition that the same was converted by defendants in pledging same with a Kansas City bank. The court found against plaintiff on this theory in refusing plaintiff's declarations of law numbered C and D. Having found against plaintiff, on the theory of his petition, it was error for the court to find for him on altogether different cause of action. A party cannot sue on one cause of action and recover upon another. Bank v. Lumber Co., 121 Mo. 324; Reed v. Bott, 100 Mo. 62; Roden v. Helm, 192 Mo. 71; Spindle v. Hyde, 247 Mo. 32.

*E. M. Grossman* for respondents.

(1) Appellants (defendants below) were guilty of conversion in the following respects: (1) The refusal and rejection of administrator's tender constituted conversion, such rejection having been made on grounds other than insufficiency in amount. 38 Cyc. 134 and cases there cited. (2) The sale of this said collateral in Saint Louis instead of in Jefferson County constituted a conversion. (3) The length of time of publication of notice of sale was insufficient and that fact constituted conversion. (4) The collateral advertised for sale was not described with full particularity and certainty and fullness. (5) The notice of sale fails to describe separately the property securing each of the notes. Laclede National Bank v. Richardson, 156 Mo. 280;

Perry on Trusts (4 Ed.), sec. 602. (6) The collateral was sold, as appears from the notice of sale, for the payment of debts other than the two five thousand dollar notes to secure which it had been given. 31 Cyc. 823, note 88. (7) The appellants, though holders of the two five-thousand-dollar notes, undertook to sell the collateral given to secure those notes, though they were not then the owners of the collateral, having wrongfully transferred and rehypothecated the collateral separate and apart from the notes secured by it. Richardson v. Ashby, 132 Mo. 238; Schaaf v. Fries, 90 Mo. App. 111; 31 Cyc. 836. (2) Respondent was entitled to recovery only the excess value of the collateral over and above the amount due on the debt for which the collateral was pledged. A suit in conversion is the proper remedy and the trial court had the right to set off against the claim the unpaid balance due on the two five-thousand-dollar notes. 31 Cyc. 845-847; 23 Cyc. 799; McGrew v. Railroad Company, 87 Mo. App. 250; Grinnell v. Emerson, 80 Mo. App. 322; President v. Harris, 26 Atl. 523; Hathaway v. Fall River National Bank, 131 Mass. 14. (3) Neither under the provisions of the collateral agreement nor under the law have appellants the right, as against the administrator of an insolvent estate, to apply the excess proceeds from the sale of the collateral pledged with secured notes to the payment of unsecured demands against deceased's estate. Gillet v. Bank of America, 160 N. Y. 549, 55 N. E. 292; Hathaway v. Fall River Bank, 131 Mass. 14; Loyd v. Lynchburg National Bank, 86 Va. 690; R. S. 1909, sec. 1868.

ALLEN, P. J.—This is an action brought by the administrators of the estate of Otis M. Munroe, to recover for the alleged conversion by defendants of certain collateral pledged by Munroe to secure the payment of two promissory notes in the sum of $5000 each.

The petition, after alleging the death of Otis M. Munroe on April 9, 1915, and the appointment and qualification of plaintiffs as administrators of his estate,

avers that at the time of Munroe's death he was indebted to the Broadway Bank of St. Louis in the sum of $10,000 upon two promissory notes, each for the sum of $5000, one dated February 5, 1915, due sixty days after date; and the other of date May 19, 1913, due on demand; that to secure the payment of the note of date February 5, 1915, Munroe had pledged to the bank, as collateral, nine notes of third persons payable to him, described in the petition, and a certain special tax bill, said collateral being in all of the face value of $7966.65; and that to secure the payment of the other note for $5000, Munroe pledged as collateral thirteen bonds, described in the petition, of $500 each, the total being of the face value of $6500. It is alleged that after the death of Munroe, to-wit, on April 12, 1915, the bank assigned both of the notes for $5000 each, together with the collateral securing the same, to the defendants, who, in the transaction, were all represented by defendant Wm. J. Knorpp; that on August 7, 1915, plaintiffs made a good and lawful tender to defendant Wm. J. Knorpp of the full amount due on the two notes of $5000 each, and demanded the surrender to them of said notes and all of said collateral, but that the tender was refused on the ground that said defendant held the collateral as security not only for the payment of the two notes of $5000 each, but for the payment also of certain indebtedness by Munroe to defendants herein. And it is alleged that on or about August 21, 1915, plaintiffs demanded that defendants collect such of the notes held by them as collateral as were then due, and that the collateral be not sold; but that defendants refused to surrender the collateral and refused to collect said notes that were due and apply the proceeds to the payment of the principal debt.

The petition then alleges that "notwithstanding said tender and said notice, and against the wishes and over the protest of plaintiffs, and without any lawful right, and without having given fair and legal public notice, and in violation of the written agreement under

which said collateral security was pledged by said Otis M. Munroe, defendant proceeded to see all of said collateral and did, on October 29, 1915, sell all of said collateral at public auction, at the east front door of the court house in the City of St. Louis, Missouri, at which sale all of said collateral was purchased by defendant William J. Knorpp for and as the agent of the defendants herein; that at said sale and before said collateral was sold plaintiffs protested and gave public notice that they would on behalf of the estate of Otis M. Munroe, deceased, hold the parties making said sale responsible for any loss which said estate might suffer by reason thereof.''

It is alleged that the sale of said collateral was void and without authority in law for a number of reasons, of which we need notice only the following:

''(1)  That tender was made by plaintiffs to William J. Knorpp of the full amount of the debt secured by said pledged property before the sale of said pledged property was made by defendant;

. . . . .

''(4)  That under the writtien agreement pledging said property as security for the payment of said two $5,000 notes, said collateral could not be held or sold for the payment of any debt save the two $5,000 notes hereinabove mentioned.''

Averring that defendants ''wrongfully, without authority at law, and in violation of their duty as pledgees, have converted said property held as collateral for the payment of said two $5000 notes to the damage of these plaintiffs in the sum of $14,466.65, the value of said property so held as collateral,'' judgment is prayed for said sum.

The answer contains first a general denial. It is then alleged that the two notes executed by Munroe, for $5000 each, were secured by the collateral described in the petition under a certain collateral agreement which provided, among other things, that the bank, its suc-

cessors or assigns, or the holder of said notes, should
have the right to hold such collateral as security for
the payment of such notes and "as security for any
other indebtedness or liability of the maker of said notes
to said bank, its successor or assigns, whether then exist-
ing, or thereafter contracted." And it is alleged that
defendants acquired said notes from the Broadway
Bank "in due course of business, for valuable consider-
ation, on or about the — day of —— 1915;" that at
said time defendants held certain notes of Otis M. Mun-
roe, to-wit, eight notes described in the answer, each
payable to one or more of the defendants other than Wm.
J. Knorpp, and totaling in face value $5350, exclusive
of interest.

It is then alleged that after the lapse of four months
after Munroe's death, the two notes for $5000 each
being due, defendants, having notified plaintiffs of their
intention so to do, and having given due notice thereof
by publication, did, on October 29, 1915, sell said col-
lateral at public sale at the east front door of the Court
House in the city of St. Louis, to the highest and best
bidder, for the sum of $11,100; that the proceeds of such
sale, less the expense thereof, were applied first to the
payment of the two notes for $5000 each, and that the
surplus thus remaining "was applied pro rata upon the
aforesaid indebtedness of Otis M. Munroe to the various
defendants herein, and that due credit has been given
on the indebtedness of the estate of Otis M. Munroe to
these defendants for the full amount of the purchase
price of said collateral."

The cause was tried upon an agreed statement of
facts, together with certain testimony adduced. There
is but little dispute as to the facts. Otis M. Munroe was
a resident of DeSoto, Missouri. At the time of his
death, to-wit, April 9, 1916, the Broadway Bank of St.
Louis held the two notes executed by him, originally for
$5000 each, mentioned in the pleadings; to secure which
he had pledged to the bank the collateral described in
the petition. Upon one of these notes a payment had

been made from certain pledged collateral which had been collected, leaving a net balance due on that note of $4287.07. On the other note there was due $5198.88, principal and interest; making a total due on both notes of $9485.95. At the time of his death Munroe was also indebted to the defendants, other than William J. Knorpp, upon eight promissory notes, three of which were payable to the order of defendant Emma Knorpp, two to the order of defendant Minnie Knorpp, one to the order of defendant Sophia Knorpp, one to the order of defendant Josephine Knorpp, and one to the "order of Sophia Knorpp, or Minnie Knorpp, or Josephine Knorpp or Emma Knorpp." These notes aggregated $5350 exclusive of interest. Shortly after Munroe's death, and during the month of April, 1915, defendants purchased from the Broadway Bank the two notes of $5000 each, which were assigned to the defendants, together with the collateral securing the same; defendant Wm. J. Knorpp representing all of the defendants in the transaction. Thereafter, on April 30, 1915, letters of administration on the estate of Munroe were granted to the plaintiffs herein.

Mr. Hornsby, one of the plaintiffs herein, testified that on August 7, 1915, in behalf of the Munroe estate, he made to Wm. J. Knorpp a certain tender by reading to him a typewritten paper, which was read in evidence, and tendering to him certain notes and cash. It appears that plaintiffs were then under the impression that defendant Wm. J. Knorpp, alone, owned the two notes for $5000 each. In making such tender it was conceded that, in addition to the two notes of $5000 each, the estate of Otis M. Munroe owed defendant Wm. J. Knorpp a balance of $756.30 upon a note executed by Munroe to the order of said Knorpp, and also the sum of $1401.50, being the amount standing to the credit of said defendant on deposit in the Jefferson County bank, a private bank owned by Munroe and which closed its doors on his death. Plaintiffs, it is said, tendered to Wm. J. Knorpp five notes, described in the said typewritten paper read

in evidence, of the aggregate value of $3117.25, exclusive of interest, and $9066 in legal tender. Of these five notes two, it is said, were notes executed by said defendant to the order of Munroe, and three were notes executed by said defendant and another person and owned by the Munroe estate. These notes and $9066 in cash were tendered in payment of the said amounts conceded to be due from the estate to Wm. J. Knorpp, including the two notes formerly held by the Broadway Bank. And upon making such tender plaintiffs demanded that Wm. J. Knorpp deliver to them the said note executed by Munroe upon which said balance of $756.30 remained due, and the two notes formerly held by the Broadway Bank.

Testifying regarding this tender Mr. Hornsby said that defendant Wm. J. Knorpp refused the tender, stating that he had acquired and held the two notes formerly held by the Broadway Bank, for the purpose of protecting himself and his sisters on the indebtedness of the Munroe estate to them. On cross-examination the witness was asked if he did not know that one of the notes tendered by plaintiffs, viz., a note executed by one Crow and defendant Wm. J. Knorpp to the order of Munroe, for $333 and interest, had been paid; and he replied that he did not know this, saying: "We still hold that note." And he added that the administrators found the note among the assets of the estate and still retained it so far as he knew. The testimony of this witness also shows that Munroe's estate was insolvent.

In defense, Wm. J. Knorpp testified that at the time of the making of this tender he told Mr. Hornsby that he was going to retain the collateral acquired from the Broadway Bank as security for not only the two notes acquired from the bank but for the other indebtedness to himself and his sisters. The cross-examination of this witness shows that after he purchased the two notes, with the collateral, from the Broadway Bank, he separated the collateral from the notes secured thereby, and

sent the collateral to Kansas City where it was pledged as security for a personal loan made by him at a bank.

W. E. Crow, a witness for the defense, testified that the note for $333 mentioned above, executed by him and Wm. J. Knorpp, had been paid.

From the agreed statement of facts it appears that on October 29, 1915, defendants, having published a notice thereof in the St. Louis Daily Record for a period of ten days, sold the said collateral pledged by Munroe to the Broadway Bank, at public auction at the east front door of the Court House in the city of St. Louis, at which sale Wm. J. Knorpp, being the highest bidder, on behalf of himself and the other defendants, became the purchaser of all thereof for the sum of $11,100. And it further appears that these plaintiffs, at the time, protested against the sale and gave notice that they would contest the validity thereof in court and hold the defendants accountable for any loss or damage resulting therefrom to the estate. And the agreed statement of facts further shows that the proceeds of the sale of the collateral, to-wit, the said sum of $11,100, was applied first to the payment of said sum of $9485.95 due on the two notes originally held by the Broadway Bank, and that the surplus, viz., $1614.05, after deducting the expenses of the sale, was applied pro rata upon the said indebtedness of Otis M. Munroe to the defendants other than Wm. J. Knorpp, credit being given to the Munroe estate for such payments on said obligations.

The trial court found the issues in favor of the plaintiffs and rendered judgment for them in the sum of $1614.05, with interest, amounting in all to $1814.73. The court filed a memorandum to which our attention has been called, wherein the court held that the collateral pledged by Munroe to the bank could not, under the "collateral agreement" be utilized by the defendants for the payment of obligations due from the Munroe estate to them, other than the two notes which they had acquired from the Broadway Bank. The court treated the amount for which the collateral was sold,

to-wit, $11,100, as being the fair value thereof, and held that the tender made by Mr. Hornsby in August, 1915, was a sufficient and valid tender, and that the refusal to receive the same and to return the collateral to plaintiffs constituted a conversion of the latter by the defendants.

It is unnecessary to follow in detail appellants' assignments of error. The crucial questions involved will be considered in the course of the opinion.

Upon the question as to the right asserted by the defendants to retain and sell the collateral acquired by them from the Broadway Bank, for the purpose not only of satisfying the two notes acquired by them from the Bank, but in satisfaction as well of unsecured claims held by them against the estate, we shall first consider the form of the collateral agreements, or contracts of pledge, executed by Munroe to the bank. These agreements were identical. The portions of each here pertinent are as follows:

"Whereas, the undersigned has executed and delivered to the Broadway Bank of St. Louis, St. Louis, Mo., hereinafter called the 'Bank,' the above promissory note; now, in order to secure the payment of said note and all other indebtedness or liability of the undersigned to said Bank, *its successors or assigns,* do hereby assign, pledge and deliver unto the said Bank, and *its successors or assigns,* the following property, of which the undersigned is in good faith the owner, to-wit:

(Collateral described)

"And do hereby agree to and with said Bank, *its successors and assigns,* or *the holder of the above decribed note or notes,* that *said Bank* or *said holder* shall now and hereafter have the following rights in addition to those created by the circumstances from which said indebtedness or liability may arise against the undersigned, or his, its or their executors, administrators, assigns or successors, namely:

"1.   All securities and property now or hereafter deposited by the undersigned with said Bank, as col-

lateral security for the payment of such indebtedness or liability of the undersigned, shall also be held as security for any other indebtedness or liability of the undersigned to said Bank, *its successors or assigns,* whether then existing or hereafter contracted, and said Bank shall also have a lien upon any balance of the deposit account of the undersigned with said Bank existing from time to time, and upon all property of the undersigned of every description heretofore or hereafter left with said Bank, or which may come into the possession or under the control of said Bank, in any way, as security for any indebtedness or liability of the undersigned to said Bank now existing or hereafter contracted.

"2. Said Bank, *its successors or assigns,* shall at all times have the right to require from the undersigned that there shall be deposited with it or them as collateral security for all existing liabilities of the undersigned to said Bank, *its successors or assigns,* approved securities to an amount satisfactory to it or them; and upon the failure of the undersigned to keep with said Bank, *its successors or assigns,* at all times, a margin of securities for such liabilities of the undersigned, satisfactory to said Bank, *its successors or assigns,* or at any time to comply immediately with the demand for additional approved security, as collateral, or upon any failure to meet any business obligation, or upon any assignment for the benefit of creditors, or act of bankruptcy, then and in either event all liabilities of the undersigned to said Bank, *its successors or assigns,* shall, at its or their option, become immediately due or payable, notwithstanding any credit or time allowed to the undersigned by any instrument evidencing any of the said liabilities.

"3. Upon failure of the undersigned to either pay any such indebtedness when becoming or so made due, or to keep up the margin of collateral securities, as above provided, then and in either event said Bank, *its suc-*

*cessors or assigns,* may immediately, with or without advertisement, and with or without notice to the undersigned, sell any of the securities or property held by it against any or all of said indebtedness or liabilities of the undersigned, at private sale, or brokers' board or otherwise, or may, with or without notice, discount, collect, compound, compromise, settle, manage and turn the same into cash according to opportunities, at the discretion of any of the officers of said Bank, or of *its successors or assigns,* and apply the proceeds thereof as far as needed toward the payment of any or all of such indebtedness or liabilities, together with interest and all expense (legal or otherwise) of sale or collection, and hold the undersigned responsible for any deficiency remaining unpaid after such application. If any such sale be at brokers' board or at public auction, said Bank, *its successors or assigns,* may be purchaser of the whole or any part of the securities sold at such sale free from any right or equity of redemption of the undersigned, such right and equity being hereby expressly waived and released. Upon default as aforesaid, said Bank may also apply toward the payment of said indebtedness or liabilities all balances of any deposit account of the undersigned with said Bank then existing. Said Bank shall not be liable for failure to present for payment or otherwise, protest, given notice of non-payment, or other notice, or sue on any securities deposited hereunder, but shall only be liable for what it actually collects or receives on account thereof.

"It is further agreed that *upon a sale of the above described indebtedness* or liabilities, or any part thereof, *said Bank is authorized and empowered to deliver the securities pledged for the payment thereof, who shall thereupon have all the powers as holder or assignee thereof, as are hereinbefore given said Bank.*" (Italics ours.)

In construing such a contract it is elementary that if it is susceptible of two constructions, that one should be given to it which is the more favorable to the pledgor. [See Dibert v. D'Arcy, 248 Mo. 617, 154 S. W. 1116;

Gillet v. Bank, 160 N. Y. 549.] In the case last cited it is said: "It (respondent bank) further claims that under the contract it could have transferred the note and collaterals, and that thereupon the transferee would be entitled to retain and sell the property pledged, or in its possession for safe keeping, or otherwise, not only for the payment of the liabilities of the assignors to the defendant, but also for the payment of all and any claims or liabilities of theirs held by the transferee. If these contentions are to be sustained, it must be because they are plainly stated in the contract or necessarily implied from its express provisions. Such unusual and almost unlimited power over the property of another is not to be implied or inferred from doubtful or uncertain language."

In the instant case it will be noted that the contract of pledge begins by reciting that it is made in order "to secure the payment of said note and all other indebtedness or liability of the undersigned to said bank, its successors or assigns." And following this, the maker agrees "with said bank, its successors or assigns, or the holder of the above mentioned note or notes, that *said bank or said holder* shall . . . have the following rights," etc. And certain rights are thereinafter enumerated in the three paragraphs numbered 1, 2 and 3. The first paragraph gives to the bank, "its successors or assigns," the right to hold the collateral as security, not only for the note for which it is pledged, but also for any other indebtedness or liability of the maker to the bank, "its successors or assigns." Standing alone, this part of the agreement would appear to give to anyone taking the note from the bank by assignment the same right that the bank would have to hold the collateral as security, not only for the original note, but for other indebtedness of the maker to such assignee as well. However, it will be noted that at the beginning of the contract the words "holder of the above described note or notes," appear to be used as meaning something other than that meant by the words "successors or assigns." And in

the three numbered paragraphs the rights mentioned are not in terms given to any holder of the note, but are given to the bank, "its successors or assigns." The word "holder" is nowhere used in those three paragraphs. After the preliminary portion of the contract, the word "holder" does not again appear until it is found in the closing paragraph of the instrument, wherein it is provided, in substance, that upon a *sale* of the note the bank is authorized to deliver the collateral (to the purchaser) who shall thereupon have "all the powers as holder or assignee thereof" as are thereinbefore given to the bank.

It thus appears that a distinction is made between "successors or assigns," on the one hand, and "the holder of the above described note," on the other. And under the circumstances we are of the opinion that the words "successors or assigns," as used throughout the agreement, may be taken as used in a restricted or narrow sense, as meaning only such persons or corporations as might succeed to the assets and business of the bank by voluntary transfer or assignment or by operation of law. The last clause of the agreement appears to recognize that the rights enumerated in the three numbered paragraphs had not been given to a purchaser of the note from the bank; and this clause purports to give to such purchaser all of the powers (though not, in terms, all the rights) thereinbefore given to the Bank. The only power, as such, thereinbefore given to the bank is the power to sell the collateral upon default. And it is doubtful whether the right to apply the proceeds of any such sale to the satisfaction of a debt other than the original note can be said to be intended to be included within the term "powers," as thus used.

And it may be noted that if the words "successors or assigns" are to be taken in the broad sense for which appellants contend, then the second paragraph of the contract gives to any purchaser of the note from the bank the right to call for additional collateral, to be approved by such purchaser, and the failure of the pledgor

to comply with such demand would have the effect, at
the option of the purchaser, of maturing any obligations
of the pledgor to such purchaser due, by their terms, *in
futuro*. It is unreasonable to suppose that such was the
intention of the parties.

Viewing this contract of pledge as a whole we think
that it is reasonably susceptible of the construction, con-
tended for by respondents, viz., that it was not the in-
tention of the parties that a purchaser should have the
right to avail himself of any margin or surplus of the
collateral in satisfaction of his own unsecured claims
against the pledgor. Unless the contract clearly and
plainly so provides, a purchaser from the pledgee should
not be accorded such extraordinary rights. And any
ambiguity or reasonable doubt touching the construction
of the contract in this regard should be resolved in favor
of the pledgor.

In Richardson v. National Bank, 189 Mass. 95, it
was held that, under the contract of pledge there in-
volved, a purchaser of a note secured by collateral was
entitled to hold the collateral as security not only for the
note so purchased but for obligations of the maker to
such purchaser as well. The contract of pledge, how-
ever, in terms ran to the "holder or holders" of the
original note; and it was therein agreed that any "ex-
cess of collaterals" should be applicable to any other
note or claim against the maker "held by said holder
or holders." Such was likewise the holding in Mulert
v. National Bank, 210 Fed. 857, 127 C. C. A. 419, and in
Oleon et al. v. Rosenbloom, 247 Pa. St. 250, 40 Ann. Cas.
233, where similar contracts were involved. Because of
the fact that the contracts therein involved differ es-
sentially from those before us, these cases are not per-
suasive authority in the instant case. In Oleon v. Rosen-
bloom, supra, it is said: "If it be said that this is a
curious and unusual way of doing business, and such
intention on the part of the maker is not to be found,
except where clearly expressed, the answer is that in
this case it clearly expressed."

But irrespective of what construction should be placed upon the contract in this respect, we are of the opinion that these defendants could not, after the death of Munroe, by purchasing the two notes held by the bank, obtain the benefit of the surplus of the collateral pledged with those notes in satisfaction, *pro tanto*, of their own unsecured claims, and thus prefer themselves as creditors of Munroe's insolvent estate. It appears that almost immediately upon the death of Munroe, and before letters of administration had been issued upon his estate, these defendants bought the two notes from the bank, with the sole object, as the evidence shows, of selling out the collateral for the purpose of satisfying not only those notes but their own unsecured claims against the estate, and thus preferring themselves over other unsecured creditors. To permit this to be done would, it seems to us, be to run counter to the whole spirit of our administration law. In this connection we are referred to section 1294, Revised Statute, 1919 (Section 1868, Rev. Stat. 1909), limiting the right of setoff, by one sued by an administrator or executor, to those claims against the intestate or testator belonging to the defendant at the time of the decedent's death. This statute is, of course, not here involved, though the policy of the State indicated thereby may be said to be in keeping with the broad policy of the administration law which, we think, prevents these defendants, as creditors of the estate, from obtaining a priority over other creditors by utilizing the surplus of collateral acquired by them after Munroe's death. At Munroe's death the bank had the possession and control of this collateral, as pledgee, but the pledgor retained an interest therein, as to which interest the pledgee bank became a trustee. [See Dibert v. D'Arcy, supra.] The right of the bank to sell the notes and deliver the collateral to the purchasers, after the death of the pledgor, is not challenged; but the purchasers, these defendants, became in like manner, trustees with reference to the interest therein of the estate of the pledgor, then deceased. Upon the

pledgor's death, that interest, in our opinion, passed instantly to the administrators of the deceased pledgor; and any surplus value in the collateral, over and above that sufficient to satisfy the original debt to the bank, became, in effect, a trust fund to be administered for the benefit of the creditors of the insolvent estate of the deceased pledgor. [In this connection see Peters v. Bank, 86 Tenn. 224, l. c. 226.]

In this view, the defendants were without authority to hold the pledged collateral for the satisfaction of their own unsecured claims against the estate.

As said, the trial court found that there was a conversion of the collateral as of the date of the tender made by plaintiffs, as shown above. It is contended by plaintiffs, respondents here, that not only was there a conversion of the collateral, at the time of said tender, but that the sale thereof, under the circumstances, constituted a conversion. And respondents also contend that defendants, through defendant Wm. J. Knorrp, converted the collateral by separating it from the original notes for which it was pledged and pledging it to a bank in Kansas City. This contention appears to be sound (Richardson v. Ashby, 132 Mo. 238, 33 S. W. 806), but the petition does not proceed upon this theory.

We are of the opinion that the evidence warrants the conclusion reached by the trial court that defendants were guilty of a conversion of the collateral on August 7, 1915, and hence it is unnecessary to consider other acts or conduct of defendants said to have constituted a conversion. Appellants contend that they cannot be held guilty of a conversion of the collateral, as for a wrongful refusal to return it on demand, in the absence of a valid tender by plaintiffs of the amount due upon the original notes; and that there was no valid tender by plaintiffs for the reason that the so-called tender consisted of "chips and whetstones," included notes signed by Wm. J. Knorpp in which the other defendants were in no way interested, and included the Crow note which, it is said, had been paid. But whatever may

be said of this tender, we regard it as clear that the attitude assumed by the defendants, through their representative Wm. J. Knorpp, was such as to make any further tender unnecessary. When plaintiffs undertook to make the aforesaid tender they were at once informed, in substance, that defendants would not surrender the notes and collateral upon a payment of the original indebtedness but would hold the collateral to satisfy unsecured claims of the defendants against the Munroe estate. The position thus taken by defendants was such as to render a proper tender, if made, a vain and idle ceremony, and hence dispensed with the necessity of making such tender. [See Hurt v. Cook, 151 Mo. 416, 52 S. W. 396; Westlake & Button v. City of St. Louis, 77 Mo. 47; Diechmann et al. v. Diechmann, 49 Mo. 107; 33 Cyc. 134.] These defendants then placed themselves in the position of wrongfully withholding the collateral, for an unlawful purpose; and we think that the trial court committed no error in holding that they were guilty of a conversion thereof. What is said in Schaaf v. Freese, 90 Mo. App. 111, as to the necessity of a tender in such cases, upon which appellants rely, we do not regard as here applicable, for the reason that in the instant case the attitude taken by defendants dispensed with the necessity of a tender.

Appellants insist that plaintiffs, having sued in conversion for the full value of the collateral, cannot recover the surplus received by appellants from the sale of such collateral; and that if plaintiffs are entitled to recover this surplus at all, such recovery can be had only in an action for money had and received. In this view we are unable to concur. The law appears to be·that a pledgee in cases of this character, when sued for a conversion of the pledged collateral, is entitled to have the debt secured by such collateral set off against the amount of damages recoverable. [31 Cyc. 847, and cases cited.] The pledgor is entitled to recover the actual amount of loss suffered by him by reason of the pledgee's wrongful act, which, in a case of this character, is the

value of the collateral less the amount of the debt. In the case before us the trial court proceeded upon the theory that the amount which the collateral brought at the sale, to-wit, $11,100, was the reasonable value thereof, and rendered judgment for the difference between such sale price and the amount of the original debt and interest. This, we think, was proper. And though the court held that the conversion occurred on August 7, 1915, because of a stipulation in the agreed statement of facts interest was allowed from the date of the sale, viz., October 29, 1915. Of this appellants cannot complain.

We perceive no reversible error in the record. We think that the judgment below is for the right party, and that it should be affirmed. It is so ordered.

*Becker, J.,* concurs. *Daues, J.,* not sitting.