# MARCH, 1929.

The South St. Joseph Live Stock Exchange, Respondent, v. The St. Joseph Stock Yards Bank et al., Defendants; Jane Sager, Interpleader, Appellant.*

Kansas City Court of Appeals.   April 1, 1929.

*Corpus Juris-Cyc. References: Appeal and Error, 4CJ, section 2647, p. 726, n. 17; Associations, 5CJ, section 26, p. 1341, n. 58; Contracts, 13CJ, section 497, p. 536, n. 76; Exchanges, 23CJ, section 34, p. 261, n. 75; section 36, p. 262, n. 91; p. 263, n. 92; Fraudulent Conveyances, 27CJ, section 343, p. 598, n. 55; Pledges, 49CJ, section 51, p. 920, n. 25.

*Groves & Watkins* for respondent.

*Eastin & McNeely* for appellant, Sager.

BOYER, J.—Action in interpleader. On petition of the South St. Joseph Live Stock Exchange, six named defendants were directed to and did interplead for a fund of $2500 deposited in court. The petitioner will be referred to as the exchange, and St. Joseph Stock Yards Bank as the bank.

The bill of the exchange alleges its character as a voluntary association located in South St. Joseph, Missouri; that one James C. Sager was holding a membership therein at the date of his death, at which time the exchange became liable under its constitution, rules and by-laws to pay $2500, less the indebtedness of said member to other members of the exchange; that defendant bank claimed the whole of said sum; that defendant, Sylvan S. Sager, as a member of the exchange, claimed the amount of debt due him by the deceased member; that defendant, R. E. Shay also a member of the exchange claimed the amount of debt due him by the deceased member; that defendant, Hartford Fire Insurance Company and Hartford Accident & Indemnity Company, each claimed the whole amount of said fund, and that defendant, Jene Sager, as the widow of said James C. Sager, deceased, claims the whole of said fund; that plaintiff is unable to determine which of said claimants are entitled or the proportion in which they are entitled to said fund or any part thereof and requests that they be required to interplead.

The bank in its answer claims the entire fund for the reason that James C. Sager duly assigned and delivered his certificate of membership in said exchange as collateral security for a debt due and owing the bank, largely in excess of $2500; that by virtue of said assignment and delivery, all right, title and interest of every kind growing out of said membership, including the fund payable and in dispute, became the property of the bank, and that no other defendant has any right to any part thereof and requests the court to so adjudge and give full relief.

Jene Sager in her answer asserts that she, as the widow of James C. Sager, is the rightful owner of the entire fund less any indebtedness of the deceased to other members of the exchange, and that under certain provisions of the laws of the exchange, she and the members of the exchange to whom the deceased member was indebted are the only persons having any valid claim thereto.

The interpleas of the other defendants do not appear.

The trial court rendered judgment in favor of defendant R. E. Shay for the amount of his claim which appears to have been $145, and in favor of Sylvan S. Sager for his claim which appears to have been $680. They were members of the exchange and claimed these amounts out of the fund on account of the debt of the deceased member, Sager. The remainder of the fund was awarded to the bank and the claims of other defendants were denied. Defendant Jene Sager, alone, appeals. She concedes the allowance of debts to other members of the exchange, but claims the award made to the bank. The sole contest is between the bank and Jene Sager over the surplus, amounting to about $1500.

The trial as shown by the record, developed among others the following facts:

The exchange is a voluntary association, its purposes and objects evidenced by a Preamble and Laws, and inasmuch as an interpretation and a construction of those laws will be called for, it is deemed not only proper but necessary to set out all that part claiming attention. The Preamble is in these words:

"To establish and maintain a Commercial Exchange, not for pecuniary gain or profit, but to promote and protect all interests concerned in the purchase and sale of Live Stock at the South St. Joseph Stock Yards; to promote uniformity in the customs and usages at said market; to establish and maintain a system of antemortem inspection for the protection of the producer and shipper, to assist in maintaining a uniform inspection which shall be in accord with the National and State inspection laws; to use our best offices to maintain the high standard of our National and State pure food laws; to assist in stamping out all contagious diseases known to affect the Live Stock of America; to inculcate and enforce correct and high moral principles in the transaction of business; to inspire confidence in the methods and integrity of its members; to provide facilities for the orderly and prompt conduct of business; tc facilitate the speedy and equitable adjustment of disputes, and generally to promote the welfare of the St. Joseph market."

Among the sections of the Laws in effect at the time of the death of the member, James C. Sager, July 12, 1925, are the following:

"Section 1. Any person of good character and credit, and of legal age, having valuable and substantial interests centered at the

St. Joseph Stock Yards, in South St. Joseph, Mo., on presenting a written application, endorsed by at least two disinterested members of this Exchange, and stating the name and business avocation of the applicant, after ten days' notice of such application shall have been posted on the bulletin of the Exchange, may be admitted to membership in the Exchange upon the approval of at least seven affirmative ballot votes of the Board of Directors, and upon the payment of an initiation fee of five thousand dollars; or on presentation of a certificate of unimpaired or unforfeited membership, duly transferred, accompanied by a transfer fee of $100 and by signing an agreement to abide by the Rules, By-Laws and Regulations of the Exchange, and all amendments that may, in due form, be made thereto. (Amended March 15, 1920.)

"Sec. 2. Every member shall be entitled to receive a certificate of membership, bearing the seal of the Exchange and the signature of the President and Secretary; and if the member in whose name said certificate stands has paid all assessments, and has against him no outstanding, unadjusted or unsettled claims or contracts held by members of this Exchange, and said membership is in no way impaired or forfeited, it shall, upon the payment of one hundred dollars be transferred upon the books of the Exchange to any person eligible to membership, as provided in Section 1 of this Article."

"(Adopted May 17, 1910. Amended March 15, 1920—Feb. 1, 1923.)

"Sec. 6. Upon the death of any member holding a membership in his name in this Exchange, such membership shall become the property of this exchange, and the exchange shall pay to the rightful owner or owners, or their assigns, or legal representatives (ownership to be determined from the records of the exchange) the sum of two thousand five hundred dollars. Said amount to be payable within thirty days from the day such membership shall be presented to this exchange by its rightful owner or owners, assigns or legal representatives; provided, that from said amount of two thousand five hundred dollars there shall be deducted such indebtedness, if any, as may be owing to this exchange or to any member thereof by the rightful owner of such membership.

"Upon the presentation of a certificate of membership of a deceased member for redemption, the Board of Directors shall order said certificate retired and the amount paid from the beneficiary fund of this exchange.

"To provide a fund for this purpose there shall be assessed against each membership in this exchange the sum of twenty-five dollars each year, payable quarterly, January, April, July and October, and if there are not sufficient funds in said beneficiary fund to meet

said payment, the Board of Directors shall order an assessment on each membership sufficient to meet the deficiency.

"Sec. 7. To identify the actual ownership of certificates of membership in this exchange upon the written request of the actual owner of a certificate, the following will be filled out and attached to the certificate:

"This certificate is recorded with the South St. Joseph Live Stock Exchange, as the property of ——————————, but this recording should not in any manner abridge the rights of the exchange to suspend or cancel this certificate, should the party in whose name it is issued, violate any of the rules or by-laws of the exchange warranting suspension or expulsion.

"This certificate cannot be assigned or offered for transfer without the written consent of ——————————, being filed with the exchange."

James C. Sager had been a member of the exchange since 1898. He borrowed $5000 from defendant bank February 7, 1920, and at that time assigned and delivered his certificate of membership in the exchange to the bank as collateral security for said amount, and at the same time signed what is called a transfer slip attached to the certificate. The certificate of membership reads as follows:

"South St. Joseph, Missouri, No. 60.

"This certifies that Jas. C. Sager, of St. Joseph, Missouri, is a member of the South St. Joseph Live Stock Exchange, and is entitled to all the benefits and privileges of the Association.

"In witness whereof, the president and secretary, have signed this certificate and caused the seal of the Association to be affixed hereto at South St. Joseph, Missouri, this fourteenth day of March, 1898.

"HORACE WOOD,
"President."

" (SEAL)
"JNO. P. EMMERT,
"Secretary."

"Organized—1897."

The transfer slip attached thereto, reads as follows:

"To the Directors of South St. Joseph Live Stock Exchange:

"You will transfer my membership in the South St. Joseph Live Stock Exchange, to the St. Joseph Stock Yards Bank, provided, he is eligible to membership.
"(SIGNED)                                    "JAS. C. SAGER."

The bank remained in continuous possession of said certificate and transfer slip until after the death of the member. The original note became due, was renewed, five hundred dollars was paid, and the remainder of the indebtedness was divided into smaller notes,

one being for the sum of $3200, which contained the statement, "To secure the payment of this or any other liability or liabilities of mine to said bank, due or to become due or which may hereafter. . . . I have attached hereto as collateral one membership in Live Stock Exchange, number 50, . . . ." Other securities are described which were shown to have been worthless. The correct number of the membership was sixty instead of fifty. There was no other membership that Sager pledged or intended to pledge for this debt. Of the original indebtedness there still remained due the sum of $4500 and interest at the time of Mr. Sager's death.

The day after the death of James C. Sager, the Vice-President of the bank wrote the following letter which was received by the secretary of the exchange:

"George L. Root, Secretary Livestock Exchange,
"South St. Joseph, Missouri.
"Dear Sir:

"This is to notify you we have been holding as collateral to a loan signed by J. C. Sager, his membership in your association, the number is 60, and attached to it is a transfer slip signed by James C. Sager, and at this time we wish to make a legal demand on you for the insurance of $2500, which we understand is payable thirty days after the membership is presented to your office on a deceased member.

"Yours truly,
"J. A. GREENFIELD, JR.,
"Vice-President."

Some time thereafter and before September 17, 1925, Mr. Greenfield, for the bank, delivered the certificate of membership with the transfer slip to the secretary of the exchange, and at that time made a demand. The secretary testified to his interpretation of the by-laws in reference to the exchange becoming owner of the membership upon the death of a member and the redemption and cancellation of the certificate, and his further examination contains the following question and answer:

"Q. Cancelled by the Exchange and in lieu thereof the life benefit insurance provision is —? A. Is paid, yes sir."

On September 17, 1925, the bank made inquiry from the Exchange as to what decision its board had reached.

It is further in evidence that after the death of James C. Sager, sections six and seven of the laws were rescinded and the secretary of the Exchange states the purpose was, "in order that we take insurance in an old line insurance company." There was no record made in the office of the Exchange of the assignment of the Sager certificate of membership and there was no transfer thereof upon the records of the exchange. The exchange kept a card index which

contained a notation of the ownership of the membership. The record was made so the exchange would know the actual owner of the membership.

A membership in the exchange had a market value of about $1500 at the time of Mr. Sager's death and had increased in value in recent years. Assignments or transfers of memberships were frequently made and records of the exchange so show. The exchange had no record of any memberships put up for collateral. There was a total membership of eighty-seven.

Defendant, Hartford Accident & Indemnity Company, proved an indebtedness against James C. Sager, consisting of five notes of $5000 each with interest, past due and unsecured, with a payment of $4000.59. James C. Sager, deceased, left no estate warranting probate and the probate court made an order dispensing with administration upon the estate.

On the record and facts was the bank entitled to recover? We think not for several reasons.

1. Its claim to the benefit fund under the assignment of the certificate of membership cannot be sustained. The bank contends that the membership was property, entitled to property rights, was subject to assignment, was assigned, and said assignment of the membership carried with it the right to the fund payable at death of the member.

Appellant's main contention is that the fund payable at death was a benefit or gratuity which under the scheme of organization of the exchange was a thing separate and apart from the value of the membership in which the member had no interest, but which upon death belonged to the beneficiary of the deceased member, which in this case is the widow.

These contentions call for an examination, interpretation and construction of the contract entered into by the members of the exchange. In all such associations the constitution and laws constitute *the* contract. [Knota v. Stock Exchange, 189 Mo. 26, 38.] The main object to be kept in view is to arrive at the intention of the members of this exchange in reference to the benefit payable at death.

In construing their contract, evidenced by the laws of the association, all of its provisions must be given effect, if possible, and no substantive provision permitted to perish unless insurmountable obstacles stand in the way of any other course, and apparent contradictions in words and language must be harmonized away, if that course be reasonably possible, in order to interpret truly the intention and to effectuate the underlying purposes of the parties as evidenced by the whole contract. [Mathews v. Modern Woodmen, 236 Mo. 326, 342; McCartney v. Trust Company, 274 Mo. 224, 238.]

Interpreted and construed by the sound and just rules indicated, it is evident that within the scope of the contract shown in the

second and third paragraphs of section 6 of the laws, and as a substantive part of said contract, it was the intention and purpose to create and maintain a "beneficiary fund" from which payments were to be made upon the death of a member. It is expressly provided that the beneficiary fund shall be replenished by annual assessments and by further assessments to be levied if necessary by the board of directors. A "beneficiary fund" necessarily implies a boon or benefaction, and that there shall be a beneficiary. It rationally points to the mutual wish and intention of the members to create and leave a benefit for someone who had the right to rely upon the bounty of the member. Such a fund is not created to indemnify against loss in business, but the usual, if not universal, practice and purpose is to accumulate a fund for beneficial and protective purposes against loss by death.

To give effect to the evident intention of the members as expressed and necessarily implied in the second and third paragraphs of section 6, the first paragraph thereof must be read in such a way as to harmonize with that intention. There is much said by both sides upon the meaning of section 6 in behalf of their several proposed interpretations and constructions. It is evident that the first paragraph cannot be applied literally. The forms of expression are inaccurate and do not mean what they say. The words, "rightful owner" apparently are fruitful of the most difficulty to the contending parties. Reading the entire section, it can reasonably be said that the term "rightful owner" is used in a different sense in the same paragraph; that in one instance it refers to the rightful owner of the benefit after the decease of the member and in the owner, it refers to the rightful owner of the membership as shown by the records of the exchange at the time of his decease.

We draw from the entire section that it was the agreement and obligation of the exchange upon the death of a member, who according to the records of the exchange owned a membership, to pay to the rightful owner of the benefit the sum designated, "said amount to be payable within thirty days from the day said membership shall be presented to this exchange by its rightful owner or owners, assigns or legal representatives." The term "rightful owner" used in the last quotation can only be read to mean the owner of the benefit and harmonize the entire section. No other construction can be given it and preserve the life of the remainder of the section. If it can be said that conflicting intentions are shown in this section, it would be more reasonable and just, and more in accord with the purpose and intention of the members of this exchange to have that construction prevail which would guarantee the preservation of a benefit for a surviving beneficiary.

The preamble is not the sole guide that points to all the objects and purposes of the exchange. It does declare that the exchange

shall be established and maintained "not for pecuniary gain or profit," and is in no way inconsistent, but is in harmony with the declared intention in the laws to maintain a beneficiary fund.

As we interpret and construe the contract, the fund payable at death was not a part of the property of the member; he had no separable proprietary interest in it; it was not to come into existence until after his death, and his assignee could take no greater right than he possessed; consequently, his assignment did not cover the benefit.

The case law applicable to exchanges is of little aid on this particular point. No similar expression of a contract has been involved in any case cited or found. The point must be ruled according to the law applicable to the interpretation and construction of contracts in general.

2. By another path we reach the same point. The contract of assignment or pledge is subject to two or more constructions in reference to its nature and extent, and when two constructions are equally available that one ought not be adopted which is most favorable to the pledgee. [Dibert v. D'Arcy, 248 Mo. 617, 644; Hornsby v. Knorpp, 207 Mo. App. 302, 315; Citizens National Bank v. Raumbauer, 194 Mo. App. 690, 697.] Construed in this manner, what did the assignment or pledge cover? The membership was assigned and the membership as such had a market value of $1500. The right, or personal privilege, of conducting business on the floor of the exchange is a separate and distinct thing of value. Likewise, the benefit payable at death is a separate and distinct thing of value. There was no mention made of the benefit in the assignment. Did the assignor intend to assign it? We do not know. We can look at the contract of assignment, but cannot answer definitely. Two constructions are equally available. The one most favorable to the pledgee extends the subject of the pledge by implication to include the benefit. The one most favorable to the pledgor limits the subject of the pledge to that specifically described and excludes the benefit.

There can be no doubt that a membership in such an exchange is property which may be assigned and transferred subject to the conditions imposed by the exchange. [Elliott v. Merchants' Exchange, 14 Mo. App. 234; Page v. Edmonds, 187 U. S. 596; In re Gaylord, 111 Fed. 717.] It is also clear that a membership is composed of distinct rights. As said in In re Gaylord, supra, l. c. 719:

"The membership represents at least two distinct rights; the one being the personal privilege of conducting business on the floor of the exchange, with the advantages thereto pertaining, and the other which is the ownership of a right to the money value of the membership."

The Supreme Court of the United States holds that a membership as property is distinct from the assets of the corporation; and that

the right and privilege of a membership is subject to taxation, separate and distinct from the physical property of the exchange. [Rogers v. Hennepin Company, 240 U. S. 184; Citizens National Bank v. Durr, 257 U. S. 99.]

In the present case there is presented at least three separate and distinct rights or things of value; that is, he right to operate on the exchange; the right to the money value of the membership, and the right to the value of the death benefit. Assuming that all three things were subject to assignment or pledge by the member, still in construing the contract of assignment before us, as the law directs, it must be restricted to specific property described and cannot be extended by the most favorable interpretation in behalf of the pledgee to include the benefit. If the rights and privileges in a membership are property separable from the property of the exchange for purposes of taxation, for much stronger reasons it would appear that the fund in question must be considered separable from the money value of the membership itself, and that the assignment or pledge did not cover it.

3. Another view: This is an action in interpleader, tried as in equity, and the whole matter is open to review and for disposition upon equitable principles. [State ex rel. v. Trimble, 289 S. W. 922-3; Bush v. K. C. Life Ins. Co., 214 S. W. 1. c. 178; Trust Company v. Regan, 193 Mo. App. 290.] There were unsecured debts against the estate of deceased member to a large amount. The probate court ordered letters of administration dispensed with, necessarily upon the finding that there was no property in the estate in excess of the absolute property of the widow. Even though the benefit payable at death be treated as an asset of the deceased member and of his estate, it would belong either to the administrator or to the widow, within the limit of her absolute property, because the assignment or pledge of the membership was void as to creditors, existing and subsequent. [Sec. 2275, R. S. 1919; In re M. J. Hoey & Company, 19 Fed. (2d) 764; Bullene v. Barnett, 87 Mo. 185; Scudder v. Payton, 65 Mo. App. 314.]

The pledgor retained in his power dominion over the property pledged and held in his hands the absolute power to decrease or completely consume or destroy the value of the property. He could, as he did, become indebted to members of the exchange; the exchang could, as it subsequently did, change the by-laws; he could have become indebted to the exchange itself and the other members in excess of the amount of the fund agreed to be paid at death; he could have voluntarily withdrawn from the exchange or could have subjected himself to suspension or expulsion.

The bank received the assignment subject to all the conditions of the laws of the exchange, the membership was not transferred, and

by its course of dealing with the assignor and by permitting him to remain in complete dominion over the value of the property, it will be held to have waived its right of lien to the benefit, if any, and its consent thereto will be implied. [Moffett Bros. & Anderson Commission Company v. Kent, 5 S. W. (2d) 395.]

The assignment or pledge being void as to creditors, the administrator of the estate of the deceased member could have recovered the fund in question if an asset of the estate. If necessary to consider the case in this aspect, then the widow presents superior equities. Her claim of absolute property as the widow of deceased is superior to the rights of creditors. [Parsons v. Harney, 281 Mo. 413, 420.] The administrator would take merely the legal title while the equitable title remained in the distributee. Even though considered as an asset of the estate the equitable title in this case was in the widow, which was found and decreed by the probate court, and even though there had been no order dispensing with administration, the widow is still vested with the equitable ownership to the extent of her absolute property, and the law would not require the useless procedure of an administration in order to recover property and deliver it to the equitable owner. [Richardson v. Cole, 160 Mo. 372; Mahoney v. Nevins, 190 Mo. 360, 368; Fairchild v. Lahman, 13 Fed. (2d) 252, 254.]

The conclusion is that the bank was not entitled to recover. First. Because the contract between the members of the exchange shows an intention to create and confer a benefit, separable from the proprietary interest of the member. Second. Because the contract of assignment is subject to two constructions and cannot be extended by implication favorable to the pledgee to cover the benefit fund. Third. Because the assignment or pledge was void as to creditors, and the widow has superior equities.

This case should be reversed and remanded with directions to the trial court to deny the claim of the bank and to award the fund allowed the bank to Jene Sager. It is so ordered. *Arnold, J.,* concurs; *Bland, J.,* dissents; *Trimble, P. J.,* absent.